Peter E. ROSE, Plaintiff,

v.

A. Bartlett GIAMATTI, et al., Defendants.

Bankruptcy No. C–2–89–0577.

United States District Court, S.D. Ohio, E.D.

July 31, 1989.

See also, 721 F. Supp. 924.

Robert G. Stachler, Taft, Stettinius & Hollister, Cincinnati, Ohio, for plaintiff.

Gerald V. Weigle, Dismore & Shohl, Cincinnati, Ohio, for Giamatti, MLB.

Robert C. Martin, Lindhorst & Dreidame, Cincinnati, Ohio, for Cincinnati Reds.

John Elam, Vorys, Sater, Seymour and Pease, Columbus, Ohio, for Giamatti & Major League Baseball.

## MEMORANDUM AND ORDER

HOLSCHUH, District Judge.

### I. INTRODUCTION

This action by Peter Edward Rose against A. Bartlett Giamatti and others, initially filed in the Court of Common Pleas of Hamilton County, Ohio at Cincinnati, and removed to the United States District Court for the Southern District of Ohio on July 3, 1989, was transferred forthwith to the Eastern Division of this Court by an order issued by Judge Carl B. Rubin and Judge Herman J. Weber, Judges of this Court sitting in the Western Division at Cincinnati. In that transfer order, Judges Rubin and Weber stated:

> Plaintiff is not just another litigant. He is instead a baseball figure of national reputation closely identified with the Cincinnati Reds and the City of Cincinnati. Under such circumstances, it would appear advisable that [this case] be transferred to a city of the Southern District of Ohio other than Cincinnati.

Although in that same order Judges Rubin and Weber expressed doubt whether this action is removable to federal court, that doubt was expressed, of course, without the benefit of the extensive briefs, voluminous exhibits and oral argument presented to the undersigned judge subsequent to removal. Within the expedited time schedule set by the Court and the parties, I have resolved those issues based upon the record now before me.

The Court emphasizes that the issues decided by this Memorandum and Order are solely questions of law concerning the jurisdiction of a United States district court when a case is removed from a state court based upon diversity of citizenship of the parties to the controversy. The essential facts relative to these jurisdictional issues are not in dispute, and the merits of the controversy between plaintiff Rose and defendant Giamatti are not before the Court at this time. The fact that a judge of the Court of Common Pleas of Hamilton County, Ohio, where this action was commenced, issued a temporary restraining order

against the defendants, while a relevant factor among all the circumstances, is clearly not dispositive of any of the jurisdictional issues confronting this Court. The sole question raised by the notice of removal and the motion to remand is whether, under applicable law, the federal court has jurisdiction over the subject matter of this action. For the reasons stated hereafter, I conclude that the action was properly removed to this Court, and that this Court does have jurisdiction over the action which I have a duty to recognize and to enforce.

## II. PROCEDURAL HISTORY

Plaintiff, Peter Edward Rose, is the Field Manager of the Cincinnati Reds baseball team. In February of this year, then Commissioner of Baseball Peter V. Ueberroth and then Commissioner of Baseball-elect A. Bartlett Giamatti initiated an investigation regarding allegations that Rose wagered on major league baseball games. On February 23, 1989 Giamatti retained John M. Dowd as Special Counsel for the purpose of conducting the investigation. On May 9, 1989 Dowd submitted a report to Giamatti summarizing the evidence obtained during the investigation. Commissioner Giamatti ultimately scheduled a hearing concerning the allegations for June 26, 1989.

In an effort to prevent Commissioner Giamatti from conducting the June 26 hearing, Rose filed an action in the Court of Common Pleas of Hamilton County, Ohio, on June 19, 1989, seeking a temporary restraining order and preliminary injunction against the pending disciplinary proceedings. Named as defendants in that action were A. Bartlett Giamatti, Major League Baseball, and the Cincinnati Reds. The crux of the complaint[1] is Rose's contention that he is being denied the right to a fair hearing on the gambling allegations by an unbiased decisionmaker. The complaint requests permanent injunctive relief, which, if granted, would prevent Commissioner Giamatti from ever conducting a hearing to determine whether Rose has engaged in gambling activities in violation of the Rules of Major League Baseball. Rose asks that the Court of Common Pleas of Hamilton County, Ohio determine whether he has wagered on major league baseball games, including those of the Cincinnati Reds.

Subsequent to a two-day evidentiary hearing, Common Pleas Court Judge Norbert Nadel issued a temporary restraining order on June 25, 1989. The order enjoined all defendants (1) from any involvement in deciding whether Rose should be disciplined or suspended from participation in baseball and (2) from terminating Rose's employment as Field Manager of the Cincinnati Reds, or interfering with his employment in response to any action taken by Giamatti, or in retaliation for Rose having filed the action. Judge Nadel set July 6, 1989 as the date for a hearing on plaintiff Rose's motion for a preliminary injunction. Commissioner Giamatti and Major League Baseball unsuccessfully sought review of the temporary restraining order in the Ohio Court of Appeals, First Judicial District, in Hamilton County, Ohio; the Court of Appeals held on June 28, 1989 that the temporary restraining order was not an appealable order.

On July 3, 1989, defendant Giamatti filed a notice of removal of the action from the state court to the United States District Court for the Southern District of Ohio, Western Division at Cincinnati, contending that the federal court has diversity jurisdiction over this action. Defendants Cincinnati Reds and Major League Baseball consented to the removal of the action. As previously noted, when the notice of removal was filed Judges Rubin and Weber issued an order transferring the case from the Western Division of this District to the Eastern Division for a random draw among the resident judges. The case was randomly drawn and assigned to the undersigned judge.

On July 5, 1989, Rose filed a motion to remand this action to the Court of Common

---

1. The complaint alleges seven causes of action based upon state law claims of breach of contract, breach of an implied covenant of good faith and fair dealing, breach of fiduciary duty, promissory estoppel, tortious interference with contract, negligence, and the common law of "due process and natural justice."

Pleas of Hamilton County, Ohio, asserting that there is a lack of complete diversity of citizenship between himself and the defendants, and that even if complete diversity exists, defendant Giamatti waived his right of removal by participating in the above-described proceedings in the state courts. At a conference of counsel held on July 5, 1989, the parties agreed and stipulated that the defendants would take no action against Rose until three days after the determination of the pending motion to remand. On July 10, 1989 the Cincinnati Reds filed a memorandum regarding the motion to remand, stating that the Reds take no position concerning the propriety of removal and have assumed an "entirely neutral" position in the litigation. The Commissioner filed a memorandum opposing the motion to remand on July 12, 1989, and Rose filed a reply memorandum on July 17, 1989. Oral argument was heard on July 20, 1989, and the Court, in order to decide the jurisdictional questions promptly, agreed to render its decision on July 31, 1989.

### III. DIVERSITY JURISDICTION

The United States district courts are courts of limited jurisdiction, and the federal statute permitting removal of cases filed in state court restricts the types of cases which may be removed from state court to federal court. The removal statute provides in pertinent part that "any civil action brought in a State court of which the district courts of the United States have original jurisdiction, may be removed by the defendant or the defendants to the district court of the United States for the district and division embracing the place where such action is pending." 28 U.S.C. § 1441(a). The statute also provides that except for a civil action founded on a claim arising under federal law, "[a]ny other such action shall be removable only if none of the parties in interest properly joined

and served as defendants is a citizen of the State in which such action is brought." 28 U.S.C. § 1441(b).

Defendant Giamatti contends in his notice of removal that the district court has original jurisdiction of this action by virtue of 28 U.S.C. § 1332(a), which grants original jurisdiction to the district courts in civil actions where the amount in controversy exceeds $50,000 and the action is between citizens of different states. This jurisdiction of federal courts is commonly known as "diversity" jurisdiction. The reason for granting diversity jurisdiction to federal courts was stated many years ago by Chief Justice Marshall:

However true the fact may be, that the tribunals of the states will administer justice as impartially as those of the nation, to parties of every description, it is not less true that the Constitution itself either entertains apprehensions on this subject, or views with such indulgence the possible fears and apprehensions of suitors, that it has established national tribunals for the decision of controversies between aliens and a citizen, or between citizens of different States.

*Bank of the United States v. Deveaux*, 5 Cranch 61, 87, 3 L.Ed. 38 (1809).[2] The diversity statute has historically been interpreted to require complete diversity of citizenship: "... diversity jurisdiction does not exist unless *each* defendant is a citizen of a different State from *each* plaintiff." *Owen Equipment & Erection Co. v. Kroger*, 437 U.S. 365, 373, 98 S.Ct. 2396, 2402, 57 L.Ed.2d 274 (1978) (emphasis in original). If diversity of citizenship is found to exist among the parties to this action and none of the defendants in interest properly joined and served is a citizen of Ohio, then the action is properly removable from the state court. If the required diversity of citizenship does not exist, then the action is not properly removable and must be remanded to the state court.

---

2. In oral argument, counsel for the Commissioner argued that this case should be heard by a "national tribunal":

> In the State Court in Cincinnati, I need not describe Mr. Rose's standing. He is a local hero, perhaps the first citizen of Cincinnati. And Commissioner Giamatti is viewed suspiciously as a foreigner from New York, trapped in an ivory tower, accused of bias by Mr. Rose. Your Honor, this is a textbook example of why diversity jurisdiction was created in the Federal Courts and why it exists to this very day.

With regard to the citizenship of the parties to this controversy, the complaint contains the following allegations concerning their identity and citizenship. Rose is alleged to be a resident of Hamilton County, Ohio. Commissioner Giamatti's residence is not stated in the complaint; in the notice of removal, however, he is alleged to be a citizen of the State of New York. Defendant Major League Baseball is alleged in the complaint to be an unincorporated association headquartered in New York and consisting of the two principal professional baseball leagues (National and American) and their twenty-six professional baseball clubs. The Cincinnati Reds, dba the Cincinnati Reds Baseball Club, is identified in the complaint as an Ohio limited partnership (hereinafter referred to in the singular as the "Cincinnati Reds").

The Court will accept as true for purposes of ruling on the motion to remand that plaintiff Rose is a citizen of the State of Ohio, that defendant Giamatti is a citizen of the State of New York, that defendant Cincinnati Reds is a citizen of the State of Ohio,[3] and that defendant Major League Baseball, assuming it exists as a legal entity, is comprised of the two major professional baseball leagues and their constituent twenty-six major league baseball clubs, at least one of which, the Cincinnati Reds, is a citizen of the State of Ohio.

In the present case, it appears from the allegations of the complaint that defendant Cincinnati Reds and defendant Major League Baseball are citizens of the same state as plaintiff Rose.[4] Recognizing that diversity jurisdiction is not demonstrated on the face of the complaint, defendant Giamatti includes in his notice of removal a number of allegations in support of his contention that this Court has diversity jurisdiction over this action such that it is properly removable. First, with respect to the defendant identified as Major League Baseball, the notice asserts that defendant Major League Baseball is not a "juridical entity," but is only a trade name utilized by the professional baseball clubs of the American and National Leagues and thus has no citizenship for diversity purposes. Notice of Removal, ¶ 7. Second, the notice asserts that any citizenship ascribed to Major League Baseball should be disregarded for purposes of removal, "since Major League Baseball is not a proper party to this action and is at most a nominal party against which no claim or cause of action has been asserted." *Id.* Finally, the notice asserts that Major League Baseball was "fraudulently joined" as a defendant for the purpose of attempting to defeat the removal jurisdiction of this Court. In a similar vein, the notice asserts that the defendant Cincinnati Reds is not a proper party to this action, is only a nominal party, and was fraudulently joined for the same purpose of defeating this Court's removal jurisdiction. *Id.,* at ¶ 8.

The issues framed by the notice of removal, the motion to remand, and the briefs of the parties are, accordingly, as follows:

1. Is the named defendant, Major League Baseball, a legal entity which has a state of citizenship for diversity purposes?

2. Can the citizenship of either Major League Baseball or the Cincinnati Reds be disregarded for diversity purposes?

3. If diversity of citizenship among the parties properly joined in this action is found to exist, has defendant Giamatti nevertheless waived his right to remove this action to federal court?

The Court will address each of these issues in turn.

A. *THE CITIZENSHIP OF DEFENDANT MAJOR LEAGUE BASEBALL*

Rose asserts that Major League Baseball is an unincorporated association created by

---

3. For purposes of diversity, a limited partnership is considered to be a citizen of each state in which its partners are citizens. *See Bedell v. H.R.C. Ltd.,* 522 F.Supp. 732, 736 n. 8 (E.D.Ky. 1981). Although there is no indication in the record of the state or states of citizenship of the partners in the Cincinnati Reds, the parties agree that the Cincinnati Reds is an Ohio resident. Therefore, the Court will assume for purposes of this motion that at least one of those partners is a citizen of the State of Ohio.

4. *See* discussion regarding the citizenship of an unincorporated association *infra* pp. 912–913.

virtue of the execution of the "Major League Agreement,"[5] an agreement entered into by and between the National League of Professional Baseball Clubs and each of its twelve constituent member clubs, and the American League of Professional Baseball Clubs and each of its fourteen constituent member clubs. Rose argues that the Major League Agreement creates an unincorporated association which operates under the name Major League Baseball. He contends that the association has officers, has previously described itself as an unincorporated association, and has acted in this case and in other cases as an unincorporated association capable of bringing suit and subject to being sued. Commissioner Giamatti contends that Major League Baseball is merely a trade name and registered service mark under which the twenty-six major league professional baseball clubs do business with respect to certain commercial activities.

Although the parties have debated the nature of the unique organization created by the Major League Agreement, Rose asserts that in the final analysis it is of no consequence whether Major League Baseball is an entity created by the Major League Agreement or simply a collective name for the twenty-six major league professional baseball clubs acting in concert.[6] The Commissioner agrees that the critical issue to be resolved by this Court is not a determination of the nature of the association formed by the twenty-six major league professional baseball clubs, but rather whether those clubs are proper parties to this action for the purpose of determining the jurisdiction of this Court.[7]

The Court agrees that, for the purpose of ruling on Rose's motion to remand, the central issue is not whether Major League Baseball is the formal name of an unincorporated association created by the Major League Agreement or a trade name and service mark used by the major league baseball clubs in certain commercial activities. The critical issue is whether the presence of the two major leagues and their twenty-six clubs, if before the Court as defendants in the form of an unincorporated association, would destroy the necessary diversity of citizenship. Inasmuch as under the Court's analysis which follows, the joinder as a defendant of the leagues and clubs as an unincorporated association doing business under the name Major League Baseball would not defeat the required diversity of citizenship, the Court, for purposes of this motion, will accept Rose's contention that the twenty-six major league professional baseball clubs joined together in the Major League Agreement to form an unincorporated association known as Major League Baseball, and that the unincorporated association known as Major League Baseball is before this Court as a properly served defendant in this case.

■ It is undisputed that, for purposes of determining the citizenship of an unincorporated association, an unincorporated association has no citizenship of its own, but is a citizen of every state in which each of its constituent members is a citizen. *United Steelworkers of America, AFL–CIO v. R.H. Bouligny, Inc.*, 382 U.S. 145, 86 S.Ct. 272, 15 L.Ed.2d 217 (1965); *Brocki v. American Express Co.*, 279 F.2d 785, 787 (6th Cir.), *cert. denied*, 364 U.S. 871, 81

---

**5.** See Notice of Removal, Exhibit 2, Exhibit B to Complaint.

**6.** In his reply memorandum at page 19, Rose states, "[f]inally, it does not matter whether [Major League Baseball] is, itself, an entity or simply a collective name for the twenty-six Major League clubs acting in concert. Even in the latter case, Ohio Rev.Code § 1745.01 permits Pete Rose to sue those twenty-six clubs in the name in which they act."

**7.** In oral argument, counsel for the Commissioner, after arguing that Major League Baseball

has no commonly identified characteristics of an unincorporated association, stated:

> Nevertheless, that's really beside the point here and I think the Plaintiffs recognize that. At page 19 of their brief they've stated, "Finally, it does not matter whether Major League Baseball is itself an entity or simply a collective name for the 26 Major League clubs." The issue really here is whether the 26 Major League clubs or the 25 clubs other than the Reds, which I will deal with separately, are properly parties to this case for diversity analysis.

S.Ct. 113, 5 L.Ed.2d 92 (1960). As the Court of Appeals for the Sixth Circuit stated in *Sweeney v. Hiltebrant,* 373 F.2d 491, 492 (6th Cir.1967), affirming dismissal of the case for lack of jurisdiction:

> The district court found that no jurisdiction existed on the basis of diversity of citizenship since plaintiffs are citizens of Ohio, and the [defendant], a voluntary unincorporated association with Ohio members, must also be regarded as an Ohio citizen for diversity purposes. The court was correct in so holding.

*See also Bundy v. Penn Central Co.,* 455 F.2d 277, 279 (6th Cir.1972); *Grant County Deposit Bank v. McCampbell,* 194 F.2d 469, 471 (6th Cir.1952); *Salerno v. American League of Professional Baseball Clubs,* 310 F.Supp. 729, 730 (S.D.N.Y.1969), *aff'd,* 429 F.2d 1003 (2d Cir.1970), *cert. denied sub nom., Salerno v. Kuhn,* 400 U.S. 1001, 91 S.Ct. 462, 27 L.Ed.2d 452 (1971).

The Cincinnati Reds Baseball Club, a citizen of Ohio, is one of the twenty-six major league baseball clubs which are members of the association doing business as Major League Baseball. Therefore, Major League Baseball is deemed to be a citizen of Ohio for diversity purposes. Because plaintiff Rose and the defendants Major League Baseball and the Cincinnati Reds are all citizens of Ohio, if either Major League Baseball or the Cincinnati Reds is a party properly joined in this action and whose citizenship, for diversity purposes, cannot be ignored, the lack of diversity of citizenship between plaintiff and all defendants would require the Court to conclude that the removal of the case to this Court was improper. Consequently, the Court must determine whether, as the Commissioner contends, the citizenship of these defendants should be ignored for the purpose of determining whether the removal of this case to this Court was proper.

B. *DETERMINATION OF PROPER PARTIES TO THIS ACTION FROM "THE PRINCIPAL PURPOSE OF THE SUIT"*

It is fundamental law that a plaintiff cannot confer jurisdiction upon the federal court, nor prevent a defendant from removing a case to the federal court on diversity grounds, by plaintiff's own determination as to who are proper plaintiffs and defendants to the action. As Justice Frankfurter said:

> Litigation is the pursuit of practical ends, not a game of chess. Whether the necessary 'collision of interests,' *Dawson v. Columbia Trust Co., supra* [197 U.S. 178], at 181 [25 S.Ct. 420, at 421, 49 L.Ed. 713 (1905)], exists, is therefore not to be determined by mechanical rules. It must be ascertained from the 'principal purpose of the suit,' *East Tennessee, V. & G.R. v. Grayson,* 119 U.S. 240, 244 [7 S.Ct. 190, 192, 30 L.Ed. 382 (1886)], and the 'primary and controlling matter in dispute,' *Merchants' Cotton Press Co. v. Insurance Co.,* 151 U.S. 368, 385 [14 S.Ct. 367, 373, 38 L.Ed. 195 (1894)].

*Indianapolis v. Chase National Bank,* 314 U.S. 63, 69–70, 62 S.Ct. 15, 16–17, 86 L.Ed. 47 (1941).

In considering whether diversity of citizenship exists with respect to the "principal purpose of the suit," certain doctrines are well established. First, a plaintiff cannot defeat a defendant's right of removal on the basis of diversity of citizenship by the "fraudulent joinder" of a non-diverse defendant against whom the plaintiff has no real cause of action. *See Wilson v. Republic Iron & Steel Co.,* 257 U.S. 92, 97, 42 S.Ct. 35, 37, 66 L.Ed. 144 (1921); *Allied Programs Corp. v. Puritan Ins. Co.,* 592 F.Supp. 1274, 1276 (S.D.N.Y.1984).

> The joinder of a resident defendant against whom no cause of action is stated is a patent sham, *Parks v. New York Times Co.,* 5 Cir. [1962], 308 F.2d 474, and though a cause of action be stated, the joinder is similarly fraudulent if in fact no cause of action exists, *Lobato v. Pay Less Drug Stores, Inc.,* 10 Cir. [1958], 261 F.2d 406.

*Dodd v. Fawcett Publications, Inc.,* 329 F.2d 82, 85 (10th Cir.1964); *Roe v. General American Life Ins. Co.,* 712 F.2d 450, 452 (10th Cir.1983). With respect to this doctrine, the Sixth Circuit has stated:

In fraudulent joinder cases the underlying reason for removal is that there is no factual basis upon which it can be claimed that the resident defendant is jointly liable or where there is such liability there is no purpose to prosecute the action against the resident defendant in good faith. *Wilson v. Republic Iron & Steel Co.*, 257 U.S. 92, 42 S.Ct. 35, 66 L.Ed. 144. In such cases the assertion of the cause of action against the resident defendant is treated as a sham.

*Brady v. Indemnity Ins. Co. of North America*, 68 F.2d 302, 303 (6th Cir.1933). Other courts have held that the party opposing remand has the burden of establishing either that there is no possibility that the plaintiff can establish a valid cause of action under state law against the non-diverse defendant, or that there has been an outright fraud in the plaintiff's pleading of jurisdictional facts. *E.g., B., Inc. v. Miller Brewing Co.*, 663 F.2d 545, 549 (5th Cir. Unit A 1981).

■ In many cases, removability may be determined from the original pleadings, and normally an allegation of a cause of action against the resident defendant will be sufficient to prevent removal. But when a defendant alleges that there has been fraudulent joinder, the court "may pierce the pleadings, consider the entire record, and determine the basis of joinder by any means available." *Dodd v. Fawcett Publications, Inc.*, 329 F.2d at 85 (citations omitted).

■ Used in this sense, the term "fraudulent joinder" is a term of art and is not intended to impugn the integrity of a plaintiff or plaintiff's counsel. *Nobers v. Crucible, Inc.*, 602 F.Supp. 703, 706 (W.D.Pa. 1985). Although the doctrine of fraudulent joinder applies to situations in which there has been actual fraud committed in the plaintiff's pleading of jurisdictional facts for the purpose of defeating federal court jurisdiction, the Court emphasizes that there is no allegation of any fraud and no evidence of any fraud on the part of plaintiff or plaintiff's counsel in this case. To the contrary, plaintiff's counsel are highly distinguished attorneys of great integrity who have sincerely and vigorously argued that both the Cincinnati Reds and Major League Baseball are properly joined as defendants and whose citizenship cannot be ignored under any applicable rule of law.

■ Second, it is also a long-established doctrine that a federal court, in its determination of whether there is diversity of citizenship between the parties, must disregard nominal or formal parties to the action and determine jurisdiction based only upon the citizenship of the real parties to the controversy. *Navarro Savings Ass'n v. Lee*, 446 U.S. 458, 100 S.Ct. 1779, 64 L.Ed.2d 425 (1980).

Early in its history, [the Supreme Court] established that the 'citizens' upon whose diversity a plaintiff grounds jurisdiction must be real and substantial parties to the controversy. *McNutt v. Bland*, 2 How. 9, 15 [11 L.Ed. 159] (1844); *see Marshall v. Baltimore & Ohio R. Co.*, 16 How. 314, 328–329 [14 L.Ed. 953] (1854); *Coal Co. v. Blatchford*, 11 Wall. 172, 177 [20 L.Ed. 179] (1871). Thus a federal court must disregard nominal or formal parties and rest jurisdiction only upon the citizenship of real parties to the controversy. *E.g., McNutt v. Bland, supra* [2 How], at 14; see 6 C. Wright & A. Miller, Federal Practice & Procedure § 1556, pp. 710–711 (1971).

*Id.* at 460–61, 100 S.Ct. at 1781–82; *Salem Trust Co. v. Manufacturers' Finance Co.*, 264 U.S. 182, 190, 44 S.Ct. 266, 267, 68 L.Ed. 628 (1924). A real party in interest defendant is one who, by the substantive law, has the duty sought to be enforced or enjoined. *Sun Oil Co. of Pennsylvania v. Pennsylvania Dept. of Labor & Industry*, 365 F.Supp. 1403, 1406 (E.D.Pa.1973). In contrast to a "real party in interest," a formal or nominal party is one who, in a genuine legal sense, has no interest in the result of the suit, *Grant County Deposit Bank v. McCampbell*, 194 F.2d 469, 472 (6th Cir.1952); *Bedell v. H.R.C. Ltd.*, 522 F.Supp. 732, 736 (E.D.Ky.1981), or no actual interest or control over the subject matter of the litigation. *Stonybrook Tenants*

*Ass'n, Inc. v. Alpert,* 194 F.Supp. 552, 556 (D.Conn.1961).

While these related governing principles of federal court jurisdiction are clear and not in dispute, the parties strongly disagree as to their application in the present case. But, as Justice Frankfurter stated in the *Chase National Bank* case:

As is true of many problems in the law, the answer is to be found not in legal learning but in the realities of the record.

*Indianapolis v. Chase National Bank,* 314 U.S. at 69, 62 S.Ct. at 16–17. The Court turns, then, to the realities of the record in this case to determine the real parties to this controversy.

### 1. *Defendant Giamatti*

It is apparent from the complaint that the actual controversy in this case is between Rose and Commissioner Giamatti. The complaint is replete with allegations of wrongdoing on the part of Giamatti. For example, Rose asserts that Giamatti and investigators hired by him attempted to bolster the credibility of witnesses against Rose, prejudged the truthfulness of certain testimony given as a part of the investigation, acted unreasonably in demanding information from Rose, improperly threatened him with refusing to cooperate in the investigation, requested that Rose step aside as the Reds' Field Manager without revealing to him the evidence which had been compiled concerning his alleged gambling activities, and otherwise acted improperly in violation of Giamatti's alleged duty to provide Rose with a fair and impartial hearing with respect to the allegations against him. The ultimate purpose of the action is to prevent Giamatti from conducting any hearing because of his alleged improper conduct and bias against Rose. The crux of the controversy is contained in ¶ 61 of the complaint:

In light of Giamatti's actual displayed bias and outrageous conduct in this cause, his service as an investigator, a prosecutor and a prospective judge, his written prejudgment on the case before

even hearing from Pete Rose and all of the evidence to be offered, and his denial of the procedural rights guaranteed to Pete Rose under the Rules of Procedure and the various contracts herein involved, Pete Rose will suffer irreparable injury if Giamatti is allowed to conduct the hearing. To submit to such a fatally flawed process would guarantee that Pete Rose would not receive a fair hearing, and he would be irrevocably tainted by Giamatti's continuing to pursue his various roles in this proceeding and his prejudging of the case.

The critical question now before the Court is whether, in this controversy between Rose and Giamatti, there is "the necessary collision of interests" between Rose on the one hand and the Cincinnati Reds and Major League Baseball on the other hand so that the citizenship of these defendants may not be disregarded by the Court. If the necessary collision of interests exists, then the action was improvidently removed and must be remanded to the state court. If, however, the Cincinnati Reds and Major League Baseball were fraudulently joined as parties or are only nominal parties in the controversy, then diversity of citizenship is not defeated and Rose's motion to remand this case to the Court of Common Pleas of Hamilton County, Ohio must be denied.

### 2. *The Cincinnati Reds*

Just as it is clear that the crux of the present controversy is between Rose and Giamatti, it is equally clear that, in reality, there is no controversy between Rose and the Cincinnati Reds. The complaint explicitly asserts that Rose "alleges no wrongful conduct on the part of the Reds." Complaint at ¶ 4. Despite this explicit assertion, Rose contends that "all defendants herein owe Pete Rose the contractual duty to ensure that the Commissioner adheres to the Major League Agreement and discharges his duties in accordance with the Rules of Procedure...." [8] Com-

---

**8.** This reference in the complaint is to the Commissioner's own rules of procedure which provide in part that disciplinary proceedings shall

be conducted like judicial proceedings and with "due regard for all the principles of natural justice and fair play...."

plaint at ¶ 57. In essence, Rose asserts that the Commissioner's rules of procedure concerning fair disciplinary hearings are incorporated as a part of his employment contract with the Cincinnati Reds, and that any action by Commissioner Giamatti in violation of his own rules of procedure would constitute a breach of Rose's contract with the Cincinnati Reds. It is Rose's position that the Cincinnati Reds owes him a contractual duty to see that the procedural rules are not violated, and that if Giamatti violates these rules by holding an unfair hearing and, as a result, sanctions Rose, the Reds will have failed in its duty and will have breached his contract. Rose's claim against the Cincinnati Reds, involving no present wrongful conduct on the part of the Reds, is for "anticipatory breach" of his contract.

The Major League Agreement, which unquestionably is incorporated as a part of Rose's contract with the Cincinnati Reds, creates the office of Commissioner of Baseball and vests extraordinary power in the Commissioner. The Commissioner has unlimited authority to investigate any act, transaction or practice that is even suspected to be "not in the best interests" of baseball. In connection with this authority, the Commissioner may (1) summon persons and order the production of documents, and, in case of refusal to appear or produce, impose penalties; (2) determine after investigation what preventative, remedial or punitive action is appropriate, and (3) take such action against the leagues, the clubs or individuals. Major League Agreement, Art. 1, Sec. 2. The Commissioner is given virtually unlimited authority to formulate his own rules of procedure for conducting those investigations, the only limitations being that whatever rules he adopts must recognize the right of any party in interest to appear before him and be heard, and the right of the presidents of the two major leagues to appear and be heard on any matter affecting the interests of the leagues. *Id.* at Sec. 2(e). These rules of procedure are not rules adopted by the members of Major League Baseball; they are rules promulgated solely by the Commissioner of Baseball.

In contrast to the Commissioner's own rules of procedure, the members of Major League Baseball have formally adopted extensive rules governing relations between clubs and their employees, misconduct of players and other persons, and many other matters. These rules are known as the "Major League Rules."[9] These detailed rules governing major league professional baseball have been accepted by the twenty-six major league professional baseball clubs and are recognized as binding upon them.

Rose's contract with the Cincinnati Reds provides in relevant part:

> The National League Constitution, Regulations and/or Rules and the *Major League* and Professional Baseball *Agreements and Rules,* and all amendments thereto hereafter adopted, are hereby made a part of this contract.

Notice of Removal, Exhibit 2, Exhibit Q to Complaint at ¶ 5(a) (emphasis added).

Considering the Major League Agreement, with its provisions vesting in the Commissioner the authority to promulgate his own procedural rules governing his investigation of matters not in the best interests of baseball, and its provisions for the adoption of Major League Rules binding upon every league, club, and player in major league professional baseball, it is apparent that "the Major League ... Rules" which are expressly incorporated into Rose's contract with the Cincinnati Reds are the extensive rules of conduct formally adopted by the members of Major League Baseball and not the procedural rules independently promulgated by the Commissioner which govern only his own proceedings. Furthermore, and of greater importance, there is nothing in the Major League Agreement, the Major League Rules, or in Rose's contract with the Cincinnati Reds which gives the Reds any right to prevent the Commissioner from holding a disciplinary hearing or to interfere with proceedings within the jurisdiction of the Commis-

---

**9.** The Major League Rules appear in the Notice of Removal, Exhibit 2, Exhibit D to Complaint.

sioner. In fact, the parties are in agreement that the Cincinnati Reds has no such right.

Rose concedes that the Cincinnati Reds has done nothing that would be considered a breach of his contract at this time, nor does he allege that the Cincinnati Reds has taken any action that indicates an intention to refuse to perform its contract with him in the future so as to constitute an anticipatory breach of his contract under Ohio law. *Smith v. Sloss Marblehead Lime Co.*, 57 Ohio St. 518, 523, 49 N.E. 695 (1898); *Hopkins v. Giles*, 7 Ohio App.3d 79, 80, 454 N.E.2d 175 (Ct.App.Hamilton Cty.1982) (cause of action for anticipatory breach accrues when breaching party clearly and unequivocally announces a refusal to perform the contract). Rose's argument that any violation by Giamatti of the Commissioner's own procedural rules would somehow constitute an automatic breach of Rose's contract with the Cincinnati Reds is without legal basis.

It is undeniable that the Cincinnati Reds has, as a practical matter, an interest in the outcome of these proceedings, but not in the legal sense that requires its joinder as a defendant in this action. Rose's complaint specifically alleges that there has been no wrongdoing on the part of the Cincinnati Reds, and the Reds specifically states that it will comply with the terms and conditions of its contract with Rose; there is no real controversy between these parties. The Court concludes that, for the purpose of determining diversity of citizenship, the defendant Cincinnati Reds was, in a legal sense, fraudulently joined as a defendant and that it is, at best, a nominal party in this action. Consequently, the citizenship of the Cincinnati Reds as a defendant may be disregarded for the purpose of determining whether there is complete diversity of citizenship among the parties to this action. In addition to being sued individually as a defendant, the Cincinnati Reds, for the purpose of this analysis of diversity of citizenship, is also a member of Major League Baseball, and the Court turns next to the consideration of that named defendant.

### 3. *Major League Baseball*

If Major League Baseball were a typical unincorporated association, its jurisdictional status would be more easily determined. The reality, however, is that Major League Baseball is a unique organization. A brief history of the background of the Major League Agreement and the extraordinary powers vested in the Commissioner by the association is set forth in *Charles O. Finley & Co., Inc. v. Kuhn*, 569 F.2d 527 (7th Cir.), *cert. denied*, 439 U.S. 876, 99 S.Ct. 214, 58 L.Ed.2d 190 (1978).

Prior to 1921, professional baseball was governed by a three-man National Commission formed in 1903 which consisted of the presidents of the National and American Leagues and a third member, usually one of the club owners, selected by the presidents of the two leagues. Between 1915 and 1921, a series of events and controversies contributed to a growing dissatisfaction with the National Commission on the part of players, owners and the public, and a demand developed for the establishment of a single, independent Commissioner of baseball.

On September 28, 1920, an indictment issued charging that an effort had been made to 'fix' the 1919 World Series by several Chicago White Sox players. Popularly known as the 'Black Sox Scandal,' this event rocked the game of professional baseball and proved the catalyst that brought about the establishment of a single, neutral Commissioner of baseball.

In November, 1920, the major league club owners unanimously elected federal Judge Kenesaw Mountain Landis as the sole Commissioner of baseball and appointed a committee of owners to draft a charter setting forth the Commissioner's authority. In one of the drafting sessions an attempt was made to place limitations on the Commissioner's authority. Judge Landis responded by refusing to accept the office of Commissioner.

On January 12, 1921, Landis told a meeting of club owners that he had agreed to accept the position upon the clear understanding that the owners had sought 'an authority ... outside of your own busi-

ness, and that a part of that authority would be a control over whatever and whoever had to do with baseball.' Thereupon, the owners voted unanimously to reject the proposed limitation upon the Commissioner's authority, they all signed what they called the Major League Agreement, and Judge Landis assumed the position of Commissioner.... The agreement, a contract between the constituent clubs of the National and American Leagues, is the basic charter under which major league baseball operates. The Major League Agreement provides that '[t]he functions of the Commissioner shall be ... to investigate ... any act, transaction or practice ... not in the best interests of the national game of Baseball' and 'to determine ... what preventive, remedial or punitive action is appropriate in the premises, and to take such action....' Art. I, Sec. 2(a) and (b). The Major League Rules, which govern many aspects of the game of baseball, are promulgated by vote of major league club owners....

The Major Leagues and their constituent clubs severally agreed to be bound by the decisions of the Commissioner and by the discipline imposed by him. They further agreed to 'waive such right of recourse to the courts as would otherwise have existed in their favor.' Major League Agreement, Art. VII, Sec. 2.

*Id.* at 532–33 (footnotes omitted).

Given the background of the Major League Agreement and the unique manner in which the twenty-six major league baseball clubs have agreed to govern the conduct of players and others by a completely independent Commissioner, it is clear that Major League Baseball cannot be compared or equated with a typical unincorporated association engaged in any other business. As the court in *Finley* recognized:

[B]aseball cannot be analogized to any other business or even to any other sport or entertainment. Baseball's relation to the federal antitrust laws has been char-acterized by the Supreme Court as an 'exception,' an 'anomaly' and an 'aberration.' Baseball's management through a commissioner is equally an exception, anomaly and aberration, as outlined in Part II hereof. In no other sport or business is there quite the same system, created for quite the same reasons and with quite the same underlying policies. Standards such as the best interests of baseball, the interests of the morale of the players and the honor of the game, or 'sportsmanship which accepts the umpire's decision without complaint,' are not necessarily familiar to courts and obviously require some expertise in their application. While it is true that professional baseball selected as its first Commissioner a federal judge, it intended only him and not the judiciary as a whole to be its umpire and governor.

569 F.2d at 537 (footnotes omitted).

The Commissioner's jurisdiction under the Major League Agreement to investigate violations of Major League Rules, or any activity he believes is "not in the best interests" of baseball, is exclusive. The major leagues and the twenty-six major league clubs have absolutely no control over such an investigation or the manner in which the Commissioner conducts it.[10] Rose does not challenge any provision of the Major League Agreement or the Major League Rules, including the rule prohibiting wagering on major league baseball games, nor does he challenge the Commissioner's authority under Article I, Section 2(e) of the Major League Agreement to promulgate his own rules of procedure dealing with investigations of suspected violations of the Major League Rules. What Rose challenges is Commissioner Giamatti's conduct of the investigation and disciplinary proceedings in his particular case. In short, Rose's controversy is not with Major League Baseball, but is with the office of the Commissioner of Baseball for the Commissioner's alleged failure to follow his own procedural rules in conducting the investigation of Rose's alleged gam-

---

**10.** One indicia of the complete independence of the Commissioner is Art. IX of the Major League Agreement, which provides that neither the Commissioner's powers nor his compensation may be diminished during the term of his office.

bling activities. Clearly, complete relief can be afforded with regard to the primary relief sought in the complaint—preventing Commissioner Giamatti from conducting a disciplinary hearing—without the need for any order against Major League Baseball or its constituent major league professional baseball clubs.

■ There is nothing in Rose's contract with the Cincinnati Reds or in the Major League Agreement which gives to the Cincinnati Reds or any other member of Major League Baseball any right, much less a duty, to prevent the Commissioner from conducting hearings concerning conduct "deemed by the Commissioner not to be in the best interests of Baseball." Major League Agreement, Art. I, Sec 3. The Major League Agreement empowers the Commissioner to formulate his own rules of procedure which, as previously noted, are not a part of the Major League Agreement, the Major League Rules, or Rose's contract with the Cincinnati Reds. Accordingly, disregard of those procedural rules by the Commissioner, while it may be the basis for an action against the Commissioner, would not impose contractual liability on the Cincinnati Reds or the other members of Major League Baseball based on either the Major League Agreement or Rose's own contract.

■ Rose contends that Commissioner Giamatti, in conducting disciplinary proceedings, is acting as the agent for Major League Baseball, and that Major League Baseball is therefore liable for any violation of a duty owed by the Commissioner to Rose to follow his own procedural rules. If Major League Baseball were a typical business organization, Rose's contention might have merit. However, as noted in the *Finley* case, "baseball cannot be analogized to any other business.... Baseball's management through a commissioner is ... an exception, anomaly and aberration...." 569 F.2d at 537. Whatever other activity the Commissioner may be authorized to perform as an agent on behalf of Major League Baseball, it is clear that with regard to disciplinary matters, the major league baseball clubs have made the Commissioner totally independent of their control. Under the Major League Agreement, the Commissioner's status with respect to disciplinary matters is analogous to that of an independent contractor, a person employed by Major League Baseball to act as an arbitrator and judge independent of any control by the members of Major League Baseball. Under Ohio law, it is clear that a party cannot be held liable for the conduct of such a person over whom the party has no control. *Fisher v. United States*, 356 F.2d 706, 708 (6th Cir.), *cert. denied*, 385 U.S. 819, 87 S.Ct. 41, 17 L.Ed.2d 57 (1966); *Marshall v. Aaron*, 15 Ohio St.3d 48, 51, 472 N.E.2d 335 (1984). *See also Cox v. Government Employees Ins. Co.*, 126 F.2d 254, 257 (6th Cir.1942) (voluntary association not liable for tort of a member when perpetrated beyond the scope of its control over his acts).

In support of his contention that although Major League Baseball has absolutely no control over the Commissioner in disciplinary matters, it should nevertheless be held liable for his conduct, Rose cites *Bank of Kentucky v. Adams Express Co.*, 93 U.S. 174, 3 Otto 174, 23 L.Ed. 872 (1876), a case which is clearly distinguishable from the present case. In the *Adams Express* case, the defendant used the services of a railroad company to transport money to and from various banks. When a shipment of money was lost due to the collapse of a railroad trestle, the express company sought to avoid liability to its customer for the loss on the ground that it had no control over the railroad company or its employees. The Supreme Court held that the express company, by virtue of the nature of its business, was a common carrier. In response to defendant's argument that under common law principles, a party cannot be held responsible for the acts of a person over whom the party has no control, the Court stated:

> The argument mistakes, we think, when it asserts that, upon general principles of law, no one is responsible for the consequences of any neglect except his own or that of his agents or servants. Common

carriers certainly are, and for very substantial reasons.

93 U.S. at 185, 3 Otto at 185.

The *Adams Express* case simply recognizes that there are exceptions to the established rule that no party may be held responsible for the conduct of a person over whom the party exercises no control, and that common carriers fall within one of those exceptions. Rose cites no statutes and relies on no considerations of public policy which would either prohibit the members of Major League Baseball from agreeing to the creation of an independent Commissioner to act as the final arbitrator of disputes and judge of rules infractions, or require the imposition of liability on the members of Major League Baseball if, in the exercise of his activities beyond their control, the Commissioner causes injury to another.

The Court recognizes, of course, that in this case it was Major League Baseball itself that placed the conduct of the Commissioner beyond the scope of its control, and had Rose not agreed to this unique delegation of absolute authority to the Commissioner, his claim against Major League Baseball might have some substance. It is undisputed, however, that the Major League Agreement, which deprives its members of control over the Commissioner in disciplinary matters and requires that its members "be finally and unappealably bound by [all actions taken by the Commissioner under the authority of the Agreement] and severally waive such right of recourse to the courts as would otherwise have existed in their favor," [11] is incorporated as a part of Rose's contract with the Cincinnati Reds, and Rose necessarily has agreed to its terms and conditions.

The Major League Agreement also provides:

> The form of player's contract to be used by the Major Leagues, and all contracts between Major Leagues or Clubs and their officers and employees, shall contain a clause by which the parties agree to submit themselves to the discipline of the Commissioner, and to accept his decisions rendered in accordance with this Agreement.

Major League Agreement, Art. VII, Sec. 3. While this agreement to submit to the discipline of the Commissioner does not mean that the Commissioner may with impunity ignore his own procedural rules,[12] it does mean that Rose's claims are against the Commissioner and not against Major League Baseball, which, under the Major League Agreement and Rose's own contract, has no control over the Commissioner in disciplinary proceedings.

 Finally, Rose argues that, "[m]ost important to the present case is the fact that it is the members of [Major League Baseball] who must act if any action is to be taken against Pete Rose." Reply Memorandum at 20. However, it is only if the Commissioner is allowed to proceed with a hearing, finds Rose has violated the Major League Rules concerning wagering on major league baseball games, and places him on the ineligible list does any obligation to take any action arise on the part of the major league baseball clubs.[13] In the

---

**11.** Major League Agreement, Art. VII, Sec. 2.

**12.** Giamatti has testified that anyone appearing before the Commissioner has a right to rely upon his procedural rules:

Q. Let me ask you this: do you understand that the rules of procedure, Exhibit C, are rules that you are to observe as Commissioner in carrying out your functions under the Major League agreement?
A. I recognize that I as Commissioner am bound to follow my rules of procedure. That is a different question from whether those rules of procedure are entailed in a Major League standard contract, sir. Okay?
Q. Is someone like Peter Rose entitled to rely upon those rules of procedure?

A. Anybody is entitled to rely on them if they come before the Commissioner of Baseball.

Giamatti Deposition, pp. 91–92, Exhibit C to Rose's reply brief.

At oral argument counsel for the Commissioner stated with respect to the Commissioner:

He has to answer in a court as to whether his conduct comports with whatever is required by a court respecting due process, [he does not answer] to the Cincinnati Reds, [nor] to Major League Baseball.

**13.** Major League Rule 15(c) provides in relevant part:

meantime, the member clubs of Major League Baseball occupy a necessarily neutral role in the dispute between Rose and the Commissioner. As neutral bystanders to the battle between Rose and the Commissioner which is the subject of this action, the member clubs of Major League Baseball have no legal interest in the controversy, and at most would be considered to be nominal parties for the purpose of determining diversity of citizenship. *Pesch v. First City Bank of Dallas*, 637 F.Supp. 1530 (N.D.Tex.1986).

Rose cites a number of cases in which various sports associations have been named as defendants in support of his contention that the defendant Major League Baseball is a proper party in this action. None of those cases, however, names Major League Baseball as a defendant and all of the cases are clearly distinguishable from the present action. Most involve antitrust actions.[14] Others involve allegations of trademark infringement,[15] employment discrimination,[16] the validity of the association's own rules,[17] or the enforcement of a membership agreement involving a member of the association.[18]

Rose also relies upon two cases involving labor unions, *Underwood v. Maloney*, 256 F.2d 334 (3d Cir.1958), and *Gray v. Reuth-er*, 99 F.Supp. 992 (E.D.Mich.1951), *aff'd*, 201 F.2d 54 (6th Cir.1952). *Underwood* involved an action in which plaintiffs sought to terminate the supervision of a local union by the international union without naming the international union as a defendant. The *Underwood* court properly noted that in that case, "[plaintiffs] seek relief which can be afforded them only by the International." 256 F.2d at 338. In *Gray*, a former officer of a local labor union sought a decree to set aside an election that ousted him from office and to restore him as an officer of the local union. The court held that the local union was an indispensable party. Unlike *Underwood*, Rose has joined the proper defendant, the Commissioner, for the relief he seeks, and unlike *Gray*, the Cincinnati Reds and Major League Baseball are not indispensable parties to this action.

The Ohio cases cited by Rose in support of his contention that Major League Baseball should be considered a proper defendant in this action, *Lyons v. American Legion Post No. 650 Realty Co., Inc.*, 172 Ohio St. 331, 175 N.E.2d 733 (1961), and *Miazga v. International Union of Operating Engineers, AFL–CIO*, 2 Ohio App.2d 153, 196 N.E.2d 324 (1964), did not involve the question presently before this Court in

INELIGIBLE LIST.
(1) A PLAYER OR OTHER PERSON found guilty of misconduct or other acts mentioned in Professional Baseball Rule 21, or convicted of a crime involving moral turpitude, may be placed on the 'Ineligible List' by the Commissioner.... A player or other person on the Ineligible List shall not be eligible to play or associate with any Major League or National Association Club until reinstated....
(2) NO MAJOR LEAGUE or National Association player shall knowingly play with or against a team with which, during the current season, any ineligible player or person has had any connection. Should a player knowingly play with or against any such team he shall thereupon be placed upon the Disqualified List.

**14.** *Haywood v. National Basketball Ass'n*, 401 U.S. 1204, 91 S.Ct. 672, 28 L.Ed.2d 206 (1971); *Radovich v. National Football League*, 352 U.S. 445, 77 S.Ct. 390, 1 L.Ed.2d 456 (1957); *United States Football League v. National Football League*, 842 F.2d 1335 (2d Cir.1988); *Colorado High School Activities Ass'n v. National Football League*, 711 F.2d 943 (10th Cir.1983); *World*

*Hockey Ass'n v. National Hockey League*, 531 F.2d 1188 (3d Cir.), *rev'd*, 427 U.S. 639, 96 S.Ct. 2778, 49 L.Ed.2d 747 (1976); *Powell v. National Football League*, 678 F.Supp. 777 (D.Minn.1988); *Salerno v. American League of Professional Baseball Clubs*, 310 F.Supp. 729 (S.D.N.Y.1969), *aff'd*, 429 F.2d 1003 (2d Cir.1970), *cert. denied sub nom., Salerno v. Kuhn*, 400 U.S. 1001 (1971).

**15.** *United States Golf Ass'n, v. U.S. Amateur Golf Ass'n*, 690 F.Supp. 317 (D.N.J.1988).

**16.** *Naismith v. Professional Golfers Ass'n*, 85 F.R.D. 552 (N.D.Ga.1979).

**17.** *Bath v. National Association of Intercollegiate Athletics*, 843 F.2d 1315 (10th Cir.1988); *O'Halloran v. University of Washington*, 856 F.2d 1375 (9th Cir.1988).

**18.** *O'Halloran v. University of Washington*, 856 F.2d 1375 (9th Cir.1988). Plaintiff also cites *Lamar v. American Basketball Ass'n*, 468 F.Supp. 1198 (S.D.N.Y.1979), which dealt only with personal jurisdiction over an individual defendant.

this action. Those cases dealt only with the effect of the Ohio statute, Ohio Revised Code § 1745.01, which permits an unincorporated association to bring suit or be sued in its own name.[19] Rose's right to bring suit against either an unincorporated association or a member of that association is not an issue in this case.

The Court has examined the above authorities cited by Rose, as well as others, and concludes that none supports Rose's claims against Major League Baseball in this case. The controversy here, as stated, is between Rose and Commissioner Giamatti and not between Rose and the Cincinnati Reds or between Rose and Major League Baseball. Major League Baseball is, at best, a nominal party in this action. Therefore, the citizenship of Major League Baseball may be disregarded for diversity purposes.

## IV. WAIVER OF RIGHT TO REMOVE

Rose contends that even if the Court should find that it has diversity jurisdiction in this case, the Commissioner has nevertheless waived any right to remove this action to federal court by virtue of his actions in the state courts.

■■■ The law is clear that a defendant may, by making affirmative use of the processes of the state court, waive the right to remove the action to federal court. *California Republican Party v. Mercier*, 652 F.Supp. 928, 931 (C.D.Cal.1986). The basis for this rule of law is that it is unfair to permit a defendant to experiment with his case in state court, and, upon adverse decision, remove the case for another try in federal court. *Bolivar Sand Co., Inc. v. Allied Equipment, Inc.*, 631 F.Supp. 171, 172 (W.D.Tenn.1986). Any intent to waive the right to remove, however, must be evidenced by "clear and unequivocal" action. *Bedell v. H.R.C. Ltd.*, 522 F.Supp. 732, 738 (E.D.Ky.1981) (footnote omitted).

■■ Rose acknowledges these principles and admits that, as a general rule, merely defending against a temporary restraining order does not constitute a waiver of the right to remove. It is Rose's position that

... by seeking to appeal the temporary restraining order ("TRO") to the State Court of Appeals, by taking discovery, and by requesting an evidentiary hearing,[20] Defendants have foresworn their usual policy of litigating baseball cases in federal court and have taken a stand to fight 'tooth and nail' against the State Court TRO.

Motion to Remand at 13. Rose cites *Rothner v. City of Chicago*, 692 F.Supp. 916 (N.D.Ill.1988), for the proposition that vigorous defense of a temporary restraining order waives the right to seek removal.

The *Rothner* case, cited by plaintiff, was reversed by the Seventh Circuit Court of Appeals on July 5, 1989. While questioning whether the concept of waiver applies to removal cases subsequent to 1948 Congressional amendments to the removal statute setting specific time limits for filing petitions for removal, the court nevertheless held that waiver of the right to remove occurs only where the parties have fully litigated the merits of the dispute. *Rothner v. City of Chicago*, 879 F.2d 1402, 1416–17 (7th Cir.1989) (copy attached to defendants' memorandum *contra*). The decision is in accord with the majority of cases which have held that taking defensive action in the state court in any preliminary proceedings short of an adjudication on the merits of an action will not constitute a waiver of the statutory right of removal. *Bolivar Sand*, 631 F.Supp. at 173; *Bedell*, 522 F.Supp. at 738; *Universal Steel & Metal Co. (1975) Ltd. v. Railco, Inc.*, 465 F.Supp. 7, 10 (D.Vt.1978); *Haun v. Retail Credit Co.*, 420 F.Supp. 859, 863 (W.D.Pa.1976).

---

**19.** Ohio Revised Code § 1745.01, provides:
Any unincorporated association may contract or sue in behalf of those who are members and, in its own behalf, be sued as an entity under the name by which it is commonly known and called.

**20.** Defendants contest the assertion that they requested an evidentiary hearing, stating that it was scheduled by the state court judge *sua sponte*.

Although, waiver will occur if the defendant files a permissive pleading seeking affirmative relief or takes affirmative action resulting in an adjudication on the merits of an issue which could result in the dismissal of the action in whole or in part, the mere *filing* in the state court of a pleading raising a defense which might be conclusive of the merits is insufficient for waiver. There must be further action on the part of the defendant resulting in a decision on the merits of the defense.

*Bedell,* 522 F.Supp. at 738 (footnotes omitted) (emphasis in original).

This concept is further illustrated by two early cases decided by the United States Court of Appeals for the Sixth Circuit. In *Atlanta, K. & N. Ry. Co. v. Southern Ry. Co.,* 131 F. 657 (6th Cir.), *cert. denied,* 195 U.S. 634, 25 S.Ct. 791, 49 L.Ed. 354 (1904), the court considered whether the right to remove had been waived by a defendant's participation in an action for temporary injunctive relief in state court. In that case, both parties had filed separate actions seeking preliminary injunctive relief in the Kentucky state court. The actions were consolidated, answers were filed, affidavits relating to the merits of the claims were filed, and each party filed a motion to dissolve an *ex-parte* temporary order obtained by the other. Ultimately, the party who did not maintain his preliminary injunction removed the case to federal court. The removal was timely, but the opposing party argued that the extensive proceedings which had occurred in state court constituted a waiver of the right to remove.

In refusing to accept this argument, the Court of Appeals stated the following:

[A] defendant should not be deprived of his constitutional and statutory right to a trial in a court of the United States upon the ground of waiver unless a clear case of intent to submit and have a hearing in the state court is made to appear.

*Id.* at 661. The court concluded that a fairly bright line existed between submitting a case for decision on its merits, and engaging in preliminary proceedings relating to temporary restraining orders or preliminary injunctive relief. Because the latter was not a conscious choice to submit the merits of a controversy to a state court for determination, the court concluded that even extensive participation in preliminary injunctive matters is not sufficiently indicative of a waiver to defeat the right to remove.

In this case, the defendants did appear and contest Rose's entitlement to a temporary restraining order and, after the order was issued, sought appellate review of the issuance of that order. That activity is not materially different from the activity engaged in by the defendant in *Atlanta, K. & N. Ry. Co., supra,* because it related to the propriety of the issuance of relief designed to preserve the *status quo* pending an adjudication of the merits of the underlying claims. The discovery that was conducted was taken for purposes of the preliminary injunction hearing. There is no indication in the record of bad faith, or that any of the defendants ever made a clear and unequivocal statement that removal would not be sought. Defendants did not utilize any remedy available in state court for purposes unrelated to the preliminary relief sought by Rose, nor unduly delay filing the removal petition. The petition for removal was clearly timely. Under these circumstances, and giving deference to the principle that a court should be reluctant to imply a waiver, *see Hildreth v. General Instrument, Inc.,* 258 F.Supp. 29, 30 (D.S. C.1966), the Court concludes that no waiver of the right of removal has occurred.

## V. CONCLUSION

In light of the foregoing analysis, the Court HOLDS that the controversy in this case is between plaintiff Rose and defendant Giamatti; that they are the real parties in interest in this case; that the Cincinnati Reds and Major League Baseball, are, at best, nominal parties in this controversy; and that, consequently, the citizenship of the Cincinnati Reds and Major League Baseball may be disregarded for diversity purposes. The Court determines that diversity of citizenship exists between Rose, a citizen of Ohio, and Commissioner Giam-

924

atti, a citizen of New York, and that the Court has diversity subject matter jurisdiction over this action. Defendant Giamatti is not a citizen of the State of Ohio and has not waived his right to remove this action, therefore, the action was properly removable from the Court of Common Pleas of Hamilton County, Ohio. Plaintiff Rose's motion to remand is DENIED.

The Court is aware that, in routine cases, appeals from interlocutory orders pursuant to 28 U.S.C. § 1292(b) are normally not viewed with favor by appellate courts. The instant case, however, is obviously not a routine case. Two district court judges sitting in Cincinnati transferred the case to the district court judges sitting in Columbus for the reason that the plaintiff is "a baseball figure of national reputation closely identified with the Cincinnati Reds and the City of Cincinnati" and, at the same time, expressed doubt regarding the removability of the case to the federal court. Accordingly, the Court CERTIFIES that this Order denying plaintiff Rose's motion to remand the case to the Court of Common Pleas of Hamilton County, Ohio involves a controlling question of law as to which there is substantial ground for difference of opinion and that an immediate appeal from this Order will materially advance the ultimate termination of the litigation. The Court, therefore, is certifying the case for an immediate appeal on the jurisdictional question to the United States Court of Appeals for the Sixth Circuit.

If plaintiff Rose desires to appeal the Court's ruling on the jurisdictional issue, he must file his application for appeal to the United States Court of Appeals for the Sixth Circuit within ten (10) days after the entry of this Memorandum and Order. 28 U.S.C. § 1292(b); Fed.R.App.P. 5. If Rose does not file his application within that time, a hearing on Rose's motion for a preliminary injunction will be held on Monday, August 14, 1989, at 9:00 a.m. In order to preserve the status quo until such time as an appeal is taken from this Memorandum and Order, or the hearing is held on Rose's motion for a preliminary injunction, if no appeal is taken, the restrictions on defendants' actions regarding plaintiff

Rose, as agreed by the parties in the stipulation filed in this Court on July 5, 1989, shall remain in effect until August 14, 1989.

IT IS SO ORDERED.