### PHILIP MORRIS CAPITAL CORPORATION, Plaintiff,

v.

### CENTURY POWER CORPORATION, Tucson Electric Power Company, Catalyst Energy Corporation, and San Diego Gas & Electric Company, Defendants.

No. 90 Civ. 8277 (RPP).

United States District Court, S.D. New York.

Oct. 25, 1991.

Cravath, Swaine & Moore by Alan J. Hruska, New York City, for plaintiff.

Baker & Botts by Philip J. John, Houston, Tex., for defendant Catalyst Energy Corp.

Skadden, Arps, Slate, Meagher & Flom by Barry H. Garfinkel, New York City, for defendant San Diego Gas & Elec. Co.

Cahill Gordon & Reindel by Laurence A. Silverman, New York City, for defendant Century Power Corp.

Leboeuf, Lamb, Leiby & MacRae by Charles Platt, New York City, for defendant Tucson Elec. Power Co.

## OPINION AND ORDER

ROBERT P. PATTERSON, Jr., District Judge.

This action arises from a transaction involving the sale and leaseback of an electric generating plant and certain other utility facilities. Plaintiff Philip Morris Capital Corporation ("Philip Morris"), an investor in the transaction, seeks recovery from defendants Century Power Corporation ("Century Power," previously known as Alamito Company, "Alamito"), Tucson Electric Power Company ("Tepco"), Catalyst Energy Corporation ("Catalyst"), and San Diego Gas & Electric Company ("San Diego").

The complaint charges Century Power, Tepco, and Catalyst with violations of Section 10(b) of the Securities Exchange Act of 1934 ("§ 10(b)"), 15 U.S.C. § 78j, as amended, and Rule 10b–5 thereunder. The several defendants are also charged variously with conspiracy to violate and aiding and abetting the violation of § 10(b) and Rule 10b–5, and with various state law claims grounded in fraud.

Defendants move jointly pursuant to Fed.R.Civ.P. 12(b)(1) for dismissal (1) of the federal securities claims on the grounds that the statute of limitations has run and (2) of the remaining state law claims on the ground that there is no diversity jurisdiction. Defendants also move pursuant to Fed.R.Civ.P. 9(b) and 12(b)(6) for dismissal on the grounds that the allegations of the complaint do not state any causal connection between defendants' alleged acts and plaintiff's alleged injury with sufficient particularity. Catalyst moves separately to dismiss the common law claims on the ground of lack of diversity. Defendant

San Diego moves separately to dismiss Counts VI, VIII, and IX of the complaint on the grounds of: failure to state a claim, failure to plead fraud with particularity, and lack of personal jurisdiction over San Diego.

Defendants also applied for a temporary stay of discovery under Fed.R.Civ.P. 26(c) pending this Court's decision on their motions to dismiss. That application was granted on June 17, 1991.

Because it is not deemed necessary, despite the voluminous nature of the parties' submissions, this opinion does not address every issue raised in the papers and at argument.

## BACKGROUND

In 1984, Alamito and its then parent corporation, Tepco, entered into an agreement (the "Power Sale Agreement") whereby Tepco agreed pursuant to a "take or pay" provision to buy certain minimum amounts of electric power from Alamito's generating plant. Alamito also had a second, separate power sale arrangement involving both Tepco and San Diego. Under a "Blending Agreement," Alamito would sell power to Tepco, Tepco would "blend" this Alamito power with other Tepco power, and Tepco would sell blended power back to Alamito for re-sale to San Deigo pursuant to a service contract (the "Alamito–San Diego Power Sale Agreement"). Complaint, ¶ 8.

In 1985, Tepco spun off its shares in Alamito to Tepco shareholders. In 1986, Catalyst acquired Alamito in a hostile takeover and thereafter owned almost all of Alamito's common stock. After this takeover, a disagreement arose between Alamito and Tepco, Alamito's former parent corporation, regarding Tepco's obligations under the Power Sale Agreement.

In 1986, Alamito and Tepco reached an understanding which resolved their dispute. The terms of this understanding provided that Alamito would enter into a sale and leaseback transaction involving certain of its facilities, and Alamito and Tepco would enter into a new, long-term "take or pay" agreement for the purchase of power,

the "New Power Sale Agreement". The rates provided for in the New Power Sale Agreement were calculated to assure Alamito's ability to make its payments under the lease portion of the sale and leaseback transaction. The New Power Sale Agreement also resulted in a reduced "cost of service" for Alamito and Tepco. In October 1986, Alamito and Tepco agreed to the terms of the New Power Sale Agreement, and on October 24, 1986, Alamito submitted it to the Federal Energy Regulatory Commission ("FERC") for approval. Timely motions to intervene in the FERC proceeding were filed by Tepco and by San Diego.

At an unspecified time in November 1986, Goldman, Sachs & Co. and Drexel Burnham Lambert Inc. offered Philip Morris and several other investors a private placement memorandum describing the proposed sale and leaseback transaction. Complaint, ¶ 12. Philip Morris and five other entities would ultimately become investors in the transaction.

On November 3, 1986, FERC issued a ruling in *Niagara Mohawk Power Corp.*, 37 F.E.R.C. ¶ 61,081 (1986). The essence of the ruling was that a lessee in Alamito's position was obligated to defer any gain realized from such a sale and leaseback transaction and apply that gain over the life of the lease toward reducing the rates charged to purchasing utilities. In November 1986, shortly after the *Niagara Mohawk* ruling, Alamito was informed by its FERC counsel that the new ruling could affect the proposed sale and leaseback transaction, especially with regard to the rates Alamito would be permitted to charge Tepco. Complaint, ¶ 28.

On December 17, 1986, FERC issued an order accepting the rates in the New Power Sale Agreement without suspension and instituted an investigation into the prospective reasonableness of the rates to be charged by Alamito thereunder. Several days later, at the request of the potential investors, Alamito petitioned FERC for clarification of the extent of the investigation. By order of December 29, 1986, FERC restricted the scope of its investiga-

tion to Alamito's capital structure and the rate of return to be allowed on that structure.[1] The sale and leaseback transaction closed on December 31, 1986 with the execution of, among other agreements, a Participation Agreement by Philip Morris and five other investors.

Pursuant to these agreements, Philip Morris and the other investors purchased from Alamito an electric power generating unit known as Springerville Unit 1 and an undivided, 50% interest in the common facilities of the Springerville Generating Station. These facilities were then leased back to Alamito for a period of 28 years. At the same time, the New Power Sale Agreement became effective. Under the New Power Sale Agreement, Tepco would buy from Alamito most of the output of the Springerville Unit 1 for a period of 28 years at rates which were calculated as covering Alamito's costs of operation, including its lease payments.

As security for its lease payments, Alamito granted each of the six purchasers a security interest in the New Power Sale Agreement.[2] The New Power Sale Agreement expressly prohibited Tepco from unilaterally seeking from FERC a reduction in the rates provided for therein until January 1, 1995.[3] Complaint, ¶¶ 10–11. While Tepco was not a party to the transaction, it did deliver to the investors a "Letter of Representation, Consent and Further Agreement" dated December 15, 1986. In this letter, Tepco repeated its understanding of the New Power Sale Agreement and represented the following:

1. At the FERC public hearings regarding the reasonableness of Alamito's prospective rates, Tepco would not intentionally provide any testimony supporting a position that Alamito's rates were not reasonable;

2. Tepco would not unilaterally seek reductions from FERC before January 1, 1995;

3. Even after January 1, 1995, any relief Tepco might seek from FERC would not impair Alamito's ability to pay its costs of operation, including its lease obligations.

Complaint, ¶ 23. San Diego was not a party to any of these agreements.

Philip Morris claims that in early December 1986, San Diego notified Alamito of its view that under the *Niagara Mohawk* ruling, if the proposed sale and leaseback transaction closed, it would be entitled to a reduction in the rates it was paying Alamito for blended power pursuant to the Alamito–San Diego Power Sale Agreement. Furthermore, San Diego told Alamito that it felt obligated to raise its claim with FERC before the transaction closed or risk waiving it. Philip Morris also alleges that Alamito persuaded San Diego not to make its intentions known until after the deal closed for fear the transaction would abort.[4] In addition, Philip Morris charges that San Diego suggested that Alamito should "maybe … finesse its documents to our advantage now." Complaint, ¶ 30.

Subsequently, Alamito's general counsel updated its representations and warranties to the plaintiff with a litigation letter which described Alamito's FERC proceedings involving San Diego, but failed to mention the possibility of San Diego raising a *Niagara Mohawk* challenge to the rates charged by Alamito to San Diego. Philip

---

1. Ordinarily, a public utility's rates are calculated on those costs that FERC finds are the utility's costs of service plus a rate of return based on the utility's capital structure.

2. The investors did not receive a security interest in the Alamito–San Diego Power Sale Agreement, which was the only other power sale agreement to which Alamito was a party. Defendants state, and plaintiffs do not dispute, that the Alamito–San Diego contract was much smaller in value than the Tepco contract and that Tepco was Alamito's biggest customer.

3. A right existed in Tepco to seek such a reduction pursuant to Section 205 or 206 of the Federal Power Act, 16 U.S.C. §§ 824d and 824e.

4. Due to the proposed reduction in rates pursuant to the New Power Sale Agreement, Tepco's cost of service to Alamito under the Blending Agreement and Alamito's cost of service to San Diego under the Alamito–San Diego Power Sale Agreement were to be reduced. However, no reduction in Alamito's cost of service due to the capital gain realized by Alamito on the transaction was proposed.

Morris claims that Catalyst and Tepco, each of which had made representations and warranties to the investors that it knew of no fact which would adversely affect the transaction, knew of San Diego's intention to apply for a reduction in rates for power supplied by Alamito under the Alamito–San Diego Power Sale Agreement, yet failed to disclose this information. Complaint, ¶¶ 22–24, 32–33.

In February 1989, San Diego filed with FERC a challenge to the rates it was being charged by Alamito, alleging that it was entitled to a set-off for the capital gain Alamito realized from the sale of its facilities. About the same time, the Arizona Corporation Commission ("ACC"), an Arizona state utility regulatory agency, filed a similar challenge to the rates charged to Tepco by Alamito. In accordance with its obligations under the New Power Sale Agreement, Tepco did not join either challenge.

On December 20, 1990, San Diego and Alamito submitted to FERC a proposed settlement of various disputes between them, including the treatment of the gain from the sale of the Springerville facilities. That settlement has been certified by an administrative law judge for FERC approval.

Philip Morris filed the instant suit on December 28, 1990. It charged, among other allegations, that:

1. It was not informed of the *Niagara Mohawk* decision and its potential effect on the sale and leaseback transaction;

2. Defendants Tepco, Catalyst and Century Power made false representations of material facts related to the transaction;

3. San Diego intended to bring a regulatory challenge based on *Niagara Mohawk* but conspired with the other defendants not to bring its challenge until after the transaction at issue here closed on December 31, 1986.

Plaintiff alleges that it has been damaged by defendants' actions, but specifies only that it has lost undesignated tax benefits

and suffered undesignated adverse tax consequences.

## DISCUSSION

I. **The Statute of Limitations for Philip Morris' § 10(b) and Rule 10b–5 Claims Has Run**

Defendants move to dismiss Philip Morris' § 10(b) and Rule 10b–5 claims as time-barred. After the parties briefed and argued this issue, the United States Supreme Court decided two determinative cases.

In *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson,* — U.S. —, 111 S.Ct. 2773, 115 L.Ed.2d 321 (1991), the Supreme Court ruled that the judicially implied private rights of action under § 10(b) and Rule 10b–5 are subject to the same "one year/three year" limitations period as applies to express causes of action brought by the Securities and Exchange Commission thereunder. Under this one year/three year period, for a claim to be timely, it must be brought within one year of the discovery of the alleged fraud and no later than three years after the actual occurrence of the alleged fraud. Significantly, the Court applied the new rule to the parties in *Lampf,* the case announcing the rule. *Id.,* 111 S.Ct. at 2782–83.

In *James B. Beam Distilling Co. v. Georgia,* — U.S. —, 111 S.Ct. 2439, 115 L.Ed.2d 481 (1991), the Court ruled that a prior decision applying a tax ruling retroactively to the case announcing the rule, *see Bacchus Imports, Ltd. v. Dias,* 468 U.S. 263, 104 S.Ct. 3049, 82 L.Ed.2d 200 (1984), applied to all cases then pending on direct review. *James B. Beam,* 111 S.Ct. at 2448. The Court held that it is error not to apply retroactively a rule of federal law "after the case announcing the rule has already done so." *Id.* at 2446.

While *James B. Beam* involved a question of constitutionality and the instant case does not, it is clear that the *James B. Beam* holding on retroactivity in civil cases applies not only to those cases involving constitutional questions, but also to those cases applying retroactively reduced statutes of limitations. The Supreme Court

vacated *Welch v. Cadre Capital,* 923 F.2d 989 (2d Cir.1991), *vacated sub nom. Northwest Savings Bank, PaSA v. Welch,* — U.S. —, 111 S.Ct. 2882, 115 L.Ed.2d 1048 (1991), for reconsideration in light of *Lampf* and *James B. Beam.* In *Welch,* the District Court had anticipated the decisions in *Ceres Partners v. GEL Associates,* 918 F.2d 349 (2d Cir.1990) and *Lampf* and applied the one year/three year limitations period retroactively. *Welch v. Cadre Capital,* 735 F.Supp. 467, 476–477 (D.Conn. 1989). The Second Circuit reversed, holding that under the three-part test set forth in *Chevron Oil v. Huson,* 404 U.S. 97, 92 S.Ct. 349, 30 L.Ed.2d 296 (1971),[5] the case "[fell] within the exception to the general practice of applying new judicial decisions retroactively." *Welch,* 923 F.2d at 991, 993. That *Welch* was remanded by the Supreme Court for reconsideration in light of *Lampf* and *James B. Beam* is a clear indication that the *James B. Beam* analysis was meant to apply to cases involving retroactively reduced statutes of limitations. Furthermore, in its reconsideration of *Welch* after remand, the Second Circuit conclusively held, "[T]he retroactive ruling in *Lampf* is to be applied retroactively to all cases not finally adjudicated on the date when *Lampf* was decided. *Welch v. Cadre Capital,* 946 F.2d 185, 187–88 (2d Cir.1991).

■ In light of these recent decisions, the limitations period adopted in *Lampf* must be applied to the present case. Philip Morris filed this suit on December 28, 1990, more than three years after the December 31, 1986 closing of the transaction at issue. Accordingly, Philip Morris' § 10(b) and Rule 10b–5 claims is not timely and are dismissed.

## II. Catalyst is an Indispensible Party

Having dismissed all of plaintiff's claims arising under federal statutes, this Court no longer has subject matter jurisdiction pursuant to 28 U.S.C. § 1331. Further-more, because both plaintiff Philip Morris and defendant Catalyst have their principal places of business in New York, Complaint, ¶¶ 2, 4, there is not complete diversity of citizenship between plaintiff and all defendants as required for diversity jurisdiction pursuant to 28 U.S.C. § 1332.

Philip Morris requests that this Court dismiss Catalyst from this lawsuit, thus restoring complete diversity and preserving the plaintiff's filing date as to counts against the remaining defendants. Letter from Plaintiff's Counsel, June 24, 1991. In order to do this, this Court must determine whether such dismissal would comport with the requirements of Fed.R.Civ.P. 19(b).

Rule 19(b) provides that:

If a person ... cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person thus being regarded as indispensable.

In *Provident Tradesmens Bank and Trust Co. v. Patterson,* 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968), the Supreme Court definitively outlined the four factors that a court should consider in determining whether a party is indispensible:

(1) the plaintiff's interest in having a federal forum, with the strength of this interest dependent upon whether a satisfactory alternative forum exists;

(2) the defendant's interest in avoiding multiple litigation, inconsistent relief, and sole responsibility for jointly shared liability;

(3) the absent co-defendant's inability to protect its interests in any judgement rendered; and

(4) the public interest in complete, consistent, and efficient settlement of controversies.

---

**5.** In *Chevron Oil,* the Supreme Court held that in deciding whether a new rule of decision will be denied retroactive application, a court should:

1. consider whether the decision establishes a new principle of law;

2. weigh the merits and demerits of each case by looking to the prior history of the rule in question and its purpose and effect; and

3. weigh any inequity imposed by retroactive application.

404 U.S. at 106–107, 92 S.Ct. at 355–56.

*Provident Tradesmens,* 390 U.S. at 109–111, 88 S.Ct. at 737–39.

■ Substantial discretion is afforded to the district court in considering which factors to weigh and what weight to give them. *Envirotech Corp. v. Bethlehem Steel Corp.,* 729 F.2d 70, 75 (2d Cir.1984). As an alternative to dismissal, a court should take a flexible approach when deciding what parties need to be present for a just resolution of a lawsuit. *Jaser v. New York Property Insurance Underwriting Ass'n.,* 815 F.2d 240, 242 (2d Cir.1987). "As a consequence, very few cases should be terminated due to the absence of non-diverse parties unless there has been a reasoned determination that their non-joinder makes just resolution of that action impossible." *Id.*

■ As for the first of the four *Provident Tradesmens* factors, a satisfactory alternative forum exists. All remaining claims are state law claims, and Philip Morris should be able to obtain adequate relief in a state forum if any is warranted against Catalyst and the other defendants. Furthermore, since an almost identical lawsuit brought by the other five investors against these same defendants is pending before this Court in *Chrysler Capital Corp. v. Century Power Corp.,* 91 Civ. 1937 (RPP), Philip Morris will likely benefit from any early judgement rendered against the defendants in the *Chrysler* case by virtue of collateral estoppel.[6]

As for the second factor, continuation of this lawsuit in the absence of Catalyst would harm the interests of the remaining defendants. Catalyst was the party which expected "to receive the largest immediate benefit by far" from the transaction. Complaint ¶ 32. Philip Morris alleges that Catalyst, as parent corporation of Alamito, caused Alamito to use $120 million of the proceeds of the sale of its facilities to repurchase its own stock from Catalyst. The

result was a transfer from Alamito to Catalyst of $120 million of the proceeds from the transaction. Complaint ¶ 47. It was Catalyst who allegedly "took the money and ran," so to speak. To continue this lawsuit without Catalyst might result in the remaining defendants being held responsible for what may ultimately be Catalyst's liability. Because Catalyst is not the sole shareholder of Alamito stock, there is the risk that Alamito's minority shareholders will be held liable for actions taken at the behest of their absent co-shareholder, Catalyst.

The third factor to weigh is the interest of the absent co-defendant whom it would have been desirable to join. As the *Provident Tradesmens* Court noted, "the court must consider the extent to which the judgement may 'as a practical matter impair or impede his ability to protect' his interest in the subject matter." *Provident Tradesmens,* 390 U.S. at 110, 88 S.Ct. at 738, *citing* F.R.Civ.P. 19(a). The parties have not shown that any of Catalyst's property will be affected by the outcome of this litigation.

Lastly, dismissal of Catalyst would be against the public interest because it would increase the likelihood of this Court granting "hollow and incomplete" relief. *Envirotech,* 729 F.2d at 74. The relief requested specifically includes "a mandatory injunction directing Catalyst to repay Century all amounts transferred by Alamito to Catalyst following the sale and leaseback." Complaint at 31. In the event of a FERC application of the *Niagara Mohawk* ruling to Alamito, it may be that Alamito will be unable to make its lease payments to the investors and would face bankruptcy unless Catalyst were required to make such payments. Thus, in Catalyst's absence, any determination in plaintiff's favor would result in less than complete relief for the plaintiff.

**6.** In *Allen v. McCurry,* 449 U.S. 90, 94–95, 101 S.Ct. 411, 414–15, 66 L.Ed.2d 308 (1980), the Supreme Court noted that, "[T]he Court has eliminated the requirement of mutuality in applying collateral estoppel to bar relitigation of issues decided earlier in federal suits * * *, and has allowed a litigant who was not a party to a federal case to use collateral estoppel 'offensively' in a new federal suit against the party who lost on the decided issue in the first case * * *." The principle has been adopted by the majority of state courts as well. Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction §§ 4463–64 (1981 and 1991 Supp.)

148

Having considered the four *Provident Tradesmens* factors, this Court in its discretion finds that Catalyst is an indispensible party to this action. Accordingly, this Court in equity and good conscience cannot allow this action to proceed in Catalyst's absence and, the case is dismissed for lack of diversity pursuant to 28 U.S.C. § 1332.

### CONCLUSION

For the reasons stated above, defendants' motion to dismiss this case is granted.

IT IS SO ORDERED.