**GREATER MIAMI BASEBALL CLUB LIMITED PARTNERSHIP,**
Petitioner,

v.

**Allan H. "Bud" SELIG, in his capacity as Acting Commissioner of Baseball, Respondent.**

**No. 96 CIV. 8989(LAK).**

United States District Court,
S.D. New York.

Feb. 28, 1997.

Robert M. Berson, Thomas B. Kinzler, Joseph A. Boyle, Kelley Drye & Warren, Richard M. Moss, New York City, for Petitioner.

Robert J. Kheel, Lizbeth Parker, Bruce A. Albert, Willkie Farr & Gallagher, New York City, for Respondent.

## MEMORANDUM OPINION

KAPLAN, District Judge.

This dispute over the composition of an arbitration tribunal calls upon the Court to determine whether Allan H. "Bud" Selig is, or in law must be treated as, the Commissioner of Baseball.

The dispute arises in consequence of provisions of the agreements governing professional baseball which permit major league teams to take, or "draft," the territories of minor league teams for the purpose of locating in the areas occupied by minor league teams. The drafting major league team must pay such compensation as may be agreed upon or, in default of agreement, as may be fixed by a board of arbitration. The membership of the board specified in the governing documents is comprised of the Commissioner of Baseball, five other persons designated by position, and a seventh member selected by the board or, should the board fail to agree, appointed by the Commissioner. In this case, the propriety of the appointment of the board of arbitration depends upon Selig's status.

### Facts

Petitioner (the "Miracle") is the owner and operator of a minor league professional baseball team located in Fort Myers, Florida, and known as the Fort Myers Miracle. In 1992, its territory was drafted by Florida Marlins Baseball Ltd. (the "Marlins") to make way for the addition of that club to the major leagues. The two teams have been unable to agree on the compensation to be paid by the Marlins to the Miracle. In consequence, the issue must be settled by arbitration pursuant to the Professional Baseball Agreement ("PBA"),[1] Article IX of which provides in relevant part:

"In the event of a disagreement as to what constitutes just and reasonable compensation for such action, ... the Commissioner shall forthwith appoint a Board of seven (7) persons. The Board shall consist of one (1) representative of the [minor league] involved, one (1) representative of the [minor league] Club involved, one (1) representative of the Major League involved, one (1) representative of the Major League Club involved, the President of the [minor league] Association, the Commissioner, and a seventh party to be agreed upon by the aforementioned six (6) or if they cannot agree on a seventh member then the Commissioner shall appoint a sev-

1. The PBA is an agreement between the major and minor leagues "to establish a high quality relationship between Major League Baseball and the [minor leagues] whereby the [minor leagues] will continue to be a highly respected organization, closely linked cooperatively to Major League Baseball, that protects, promotes, and enhances the traditions and cultures of Baseball." (Cpt Ex. A, Art. I)

enth member.... The seventh member ... shall be an appraiser. Such appraiser shall be an impartial individual of suitable experience ..." (Kheel Aff. Ex. B, Art. IX)

The PBA explicitly provides for situations in which there is no Commissioner. "During any vacancy in the Office of the Commissioner ... the Professional Baseball Executive Council, to consist of the members of the Members of the Major League Executive Council, the President of the [Minor Leagues] and the members (not to exceed three (3)) of its Executive Committee, shall have and exercise all the powers and duties of the Commissioner in respect to [matters between the major and minor leagues]."[2] (*Id.* Art. IV)

The last acknowledged Commissioner of Baseball, Francis T. "Fay" Vincent, Jr., resigned in September of 1992. Beginning soon after Vincent's resignation, Selig, the owner of the major league Milwaukee Brewers and the chair of the Major League Executive Council ("MLEC"). took on many of the daily functions of running baseball. Selig "has served as an extraordinary and consumate spokesman for Baseball to the public, press and Congress" (Selig Dep Ex. 14), interfaces with major league clubs (*id.* 39), handles the correspondence directed to the Commissioner (*id.* 164), is involved in disciplinary proceedings (PX 34), and draws a substantial honorarium for his work (Selig.Dep.Ex. 14).

While the genesis of the dispute over composition of the Miracle–Marlins arbitration board is not clear in the record, the disagreement was in existence by the month following Vincent's resignation. The Miracle then brought suit in New York Supreme Court against the Marlins and the National League[3] to stay the arbitration. Among the

Miracle's arguments was a contention that the lack of a Commissioner would result in "any purported arbitration board [being] subject to improper control by the Major Leagues." (Kheel Aff. Ex. F) In essence, the Miracle claimed that an arbitration board constituted by the Professional Baseball Executive Council (the "PBEC") in the Commissioner's absence, although that is the procedure mandated by Article IV of the PBA, could not be impartial. The state court denied a stay and granted a defense motion to compel arbitration. It did, however, leave open the Marlins' right to challenge the impartiality of the seventh member of the panel once he was selected. (Kheel Aff. Ex. E) On May 20, 1993, the Appellate Division affirmed. (*Id.* Ex. G)

When negotiations between the Marlins and the Miracle proved fruitless, the PBEC appointed six members of the arbitration panel on June 1, 1994, as it was required to do under the PBA if in fact the office of Commissioner was vacant. Robert DuPuy, Selig's lawyer, was chosen to fill the PBEC's role as substitute for the Commissioner.[4] After the Marlins and the Miracle were unable to agree on a seventh arbitrator (*see* Kheel Aff. Ex. J), the PBEC appointed Richard Bloch on August 7, 1996. (*Id.* Ex. L)

The arbitration board's first meeting was scheduled for September 3, 1996 but adjourned at the Miracle's request until September 24, 1996 (*id.* ¶ 28) at which time a schedule requiring the submission of initial briefs or reports by December 13, 1996 was set. (*Id.* Ex. M) The Miracle brought this proceeding on November 27, 1996. The Court denied petitioner's motion for an interim stay on December 13, 1996. Five days later, respondent moved to dismiss the action. On January 23, 1997, the Court held a

---

2. Article II, Section 1, of the MLA defines the MLEC. "The Major League Executive Council is hereby created to be composed of the Commissioner, the President of each of the Major Leagues and eight (8) other Club members, four (4) from each League." (Kheel Aff. Ex. A)

3. The Marlins play in the National League.

4. The Court finds, as set forth in its February 18, 1997 decision, that DuPuy was appointed to the arbitration panel by the PBEC. Petitioner points

out that DuPuy mistakenly referred to himself as the "Representative of Major League Executive Council" in an August 8, 1996 letter. (Solomon Aff. Ex. E). Notwithstanding any misimpression DuPuy may have had as to his status, he was appointed as the PBEC's representative in a December 2, 1993 meeting. (PX 2) Indeed, petitioner has stated that "the initial six members of the board of arbitration were ... appointed ... by a group called the Professional Baseball Executive Council ..." (Nov. 27, 1996 Pet. Mem. 4)

one-day non-jury trial concerning Selig's status.

### Discussion

The Miracle contends that Selig is, or should be regarded as, the Commissioner of Baseball. It argues that the Court should appoint a nonpartisan replacement to act as Commissioner with respect to the arbitration at issue. In the alternative, petitioner claims that Selig is obliged to sit on the Arbitration Board and, given the inability of the Board to select a seventh arbitrator, to appoint that arbitrator. In any case, it argues, Bloch is not impartial and should be replaced.

Selig disputes the Miracle's basic claim, contending that he is chair of the MLEC and that he neither is nor properly may be treated as the Commissioner. He therefore asserts that the PBEC acted properly in designating DuPuy and Bloch to serve on the Board. In addition, he raises a series of procedural objections to the petition.

The Court concludes that the Marlins are an indispensable party which cannot be joined without depriving the Court of jurisdiction. In the alternative, the Court holds that Selig neither is nor is to be treated as Commissioner of Baseball and that the arbitration board has been appointed in accordance with the governing agreements. The challenge to Bloch's impartiality is rejected as premature.

### The Marlins Are An Indispensable Party

■ Petitioner, a Florida citizen, has invoked this Court's subject matter jurisdiction under 28 U.S.C. § 1332, the diversity statute.[5] Because this litigation cannot proceed without the Marlins, a Florida citizen, this case must be dismissed.

FED. R. CIV. P. 19 provides for a two-step analysis in determining whether a party is indispensable.

### Rule 19(a)

Rule 19(a) states that a person should be joined if feasible:

"if (1) in the person's absence complete relief cannot be accorded among those already parties, or (2) the person claims an interest relating to the subject of the action and is so situated that the disposition of the action in the person's absence may (i) as a practical matter impair or impede the person's ability to protect that interest or (ii) leave any of the persons already parties subject to a substantial risk of incurring double, multiple, or otherwise inconsistent obligations by reason of the claimed interest."

Petitioner claims that "[t]he Marlin's [*sic*] do not meet the Rule 19(a) test. No relief is sought against the Marlins, and their presence or absence as a party will have no effect on the Court's determination of whether Selig is the Commissioner." (Reply Mem. 4) The Court disagrees.

The fact that no relief is sought directly against the Marlins in this action does not control the Rule 19 analysis. "As a practical matter," the Marlins have an interest equal to that of the Miracle. The underlying dispute concerns the amount that the Marlins will have to pay the Miracle. The Miracle no doubt believes that an arbitration board constituted as it wishes would produce a result more to its advantage than the alternative. Any benefit that might accrue to the Miracle as a result of a panel recomposition would be paid by the Marlins. The Marlins thus have a direct stake in the outcome sufficient to satisfy Rule 19(a)(2)(i).[6] The Miracle's contention that the Marlins lack any legally pro-

---

5. The proceeding is brought under Section 5 of the Federal Arbitration Act, 9 U.S.C. § 5. The Act does not confer jurisdiction on the district courts.

6. Petitioner's reliance on *Rose v. Giamatti*, 721 F.Supp. 906 (S.D.Ohio 1989), to establish that the Marlins do not come within Rule 19(a) is unpersuasive. In that case, the court held that the Cincinnati Reds, a major league team, lacked a sufficient interest to be joined under Rule 19(a) in litigation over a disciplinary proceeding be-

tween the team's manager and the Commissioner.

> *Rose* is distinguishable. The Reds' interest in the *Rose* case was distinctly tangential. The court held that "in reality, there is no controversy between Rose and the Cincinnati Reds." *Id.* at 915. That situation bears little relationship to the case at bar, in which the financial dispute between petitioner and the absent Marlins is the crux of the issue.

tectible interest in the specific composition of the arbitration board simply begs the question. Nor is this the only reason that the Marlins should be joined.

Rule 19(a)(2)(ii) is aimed at preventing multiple litigation and inconsistent relief. An important issue in this case therefore is whether the outcome of the present litigation would bind the absent Marlins. If the Marlins would not be bound, they would be free to relitigate the issue of Selig's position, potentially subjecting Selig to inconsistent holdings.

"The doctrine of collateral estoppel ... precludes a party from relitigating in a subsequent action or proceeding an issue clearly raised in a prior action or proceeding and decided against that party or those in privity, whether or not the tribunals or causes of action are the same." *Ryan v. New York Telephone Co.*, 62 N.Y.2d 494, 500, 478 N.Y.S.2d 823, 826, 467 N.E.2d 487, 490 (1984). Those in privity "include[ ] those who are successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly coparties to a prior action." *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir.1995) (*quoting Watts v. Swiss Bank Corp.*, 27 N.Y.2d 270, 317 N.Y.S.2d 315, 320, 265 N.E.2d 739, 743–44 (1970)).

Petitioner suggests that Selig represents the Marlins' interests sufficiently to establish privity and bind the Marlins. (Reply Mem. 4) Selig's interests, however, diverge from those of the Marlins in several significant ways. Selig receives a large honorarium as chair of the MLEC and thus has a vested interest in the *status quo* which the Marlins do not necessarily share. Selig moreover, may wish to avoid devoting the time and effort that would be required by service on the arbitration panel. In contradistinction, it could well be in the Marlins' interest for Selig to serve on the panel for exactly the reason that the Miracles oppose his sitting—he is a major league owner whose interests, the Marlins might believe, would be served by an arbitration award favorable to the Marlins. Because of this divergence of inter-

ests, Selig is not able to represent the Marlins in the present litigation. Privity is lacking, and the Marlins would not be bound by the present litigation, entitling them to relitigate Selig's status. *See Local 538 United Brotherhood of Carpenters v. United States Fidelity & Guaranty Co.*, 70 F.3d 741, 744 (2d Cir.1995). Accordingly, the Marlins are a party which should be joined if feasible under Rule 19(a).

*Rule 19(b)*

Rule 19(b) provides that

"[i]f a person as described in subdivision (a)(1)-(2) hereof cannot be made a party, the court shall determine whether in equity and good conscience the action should proceed among the parties before it, or should be dismissed, the absent person being thus regarded as indispensable. The factors to be considered by the court include: first, to what extent a judgment rendered in the person's absence might be prejudicial to the person or those already parties; second, the extent to which, by protective provisions in the judgment, by the shaping of relief, or other measures, the prejudice can be lessened or avoided; third, whether a judgment rendered in the person's absence will be adequate; fourth, whether the Plaintiff will have an adequate remedy if the action is dismissed for nonjoinder."

The Supreme Court examined Rule 19(b) in *Provident Tradesmens Bank & Trust Co. v. Patterson*, 390 U.S. 102, 88 S.Ct. 733, 19 L.Ed.2d 936 (1968):

"Rule 19(b) suggests four 'interests' that must be examined in each case to determine whether, in equity and good conscience, the court should proceed without a party whose absence from the litigation is compelled .... First, the plaintiff has an interest in having a forum. Before the trial, the strength of this interest obviously depends upon whether a satisfactory alternative forum exists.... Second, the respondent may properly wish to avoid multiple litigation, or inconsistent relief, or sole responsibility for a liability he shares with another..... Third, there is the interest of the outsider whom it would have

been desirable to join .... as Rule 19(a) expresses it, the court must consider the extent to which the judgment may 'as a practical matter impair or impede his ability to protect' his interest in the subject matter.... Fourth, there remains the interest of the courts and the public in complete, consistent, and efficient settlement of controversies. Rule 19(b) also directs a district court to consider the possibility of shaping relief to accommodate these four interests." *Id.* at 109–11, 88 S.Ct. at 737–39.

The four *Provident Tradesmens* factors militate in favor of dismissal.[7]

First, the courts of New York State have been and continue to be available to petitioner. In fact, the Miracle initially chose that forum, as its original action against the Marlins was in New York Supreme Court. (Kheel Aff. Ex. E).

The second inquiry resembles closely Rule 19(a)(2)(ii). As discussed previously, any determination of Selig's status in this Court would not bind the Marlins. Accordingly, the Marlins would be entitled to relitigate Selig's status, potentially subjecting him to multiple litigation and inconsistent judicial rulings.

The third factor plainly supports a requirement of joinder of the Marlins. Whatever interest the Miracle has in this litigation is a mirror-image of the Marlins' interest. Every dollar awarded to the Miracle will come from the Marlins' coffers. To the same extent the Miracle is correct in perceiving a panel recomposition as favorable to its interests, such a recomposition would be adverse to the Marlins.

Finally, the Court must consider the public interest in limiting the expenditure of judicial and societal resources. The courts of New York State would be able to resolve the issue at bar on a single occasion, as all parties could be brought before them. In contrast, any judgment of this Court would have no effect on the Marlins, and the underlying dispute would be no closer to resolution.

For all of these reasons, the Court holds that the Marlins are an indispensable party. As the Marlins cannot be joined without ousting this Court of jurisdiction, this proceeding must be dismissed. *See Philip Morris Capital Corp. v. Century Power Corp.,* 778 F.Supp. 141 (S.D.N.Y.1991).

*Selig Is Not the Commissioner of Baseball*

Assuming *arguendo* that the Marlins are not an indispensable party, the Court nevertheless would deny petitioner's claim on the merits. Based on the evidence before the Court. it is apparent that Selig is neither the *de jure* nor the ·*de facto* Commissioner of Baseball. Accordingly, the procedures for constituting the board of arbitration in the absence of a Commissioner properly were followed.

"An officer de jure is one who holds an office to which that officer has been legally elected or appointed." 2 W. Fletcher Et Al., Fletcher Cyclopedia Of The Law Of Private Corporations § 373, at 237 (Rev. Vol.1990) ("Fletcher"). Petitioner contends that "arguably a vote may have been taken to elect [Selig] Commissioner" and he therefore is *de jure* Commissioner. (Pet.Mem.16) The Miracle's cautionary phrasing reflects the speciousness of this claim. The vote to which petitioner refers, taken on September 10, 1992, was to elect someone to preside over the joint meeting of the major leagues, as required by Article V of the Major League Agreement. (Kheel Aff. Ex. A)[8] The Court fails to comprehend petitioner's assumption

---

7. Some courts have perceived a difference between the language of Rule 19(b) and the standard articulated in *Provident Tradesmens.* This Court will employ the *Provident Tradesmens* formulation, although courts are not uniform on this point. *Compare Jaser v. New York Property Ins. Underwriting Ass'n,* 815 F.2d 240 (2d Cir. 1987) (Rule 19(b) terminology) *with Prescription Plan Service Corp. v. Franco,* 552 F.2d 493 (2d Cir.1977); *Philip Morris Capital Corp. v. Century Power Corp.,* 778 F.Supp. 141 (S.D.N.Y.1991) (*Provident Tradesmens* terminology).

8. The pertinent portion of Article V states that "[a]t all Joint Meetings ... the Commissioner shall preside, except that the Commissioner shall not preside at any Joint Meeting for the election of a Commissioner or for consideration of the term of office or duties of a Commissioner. In the absence of the Commissioner, the presiding officer shall be elected by written ballot of a majority vote...." (*Id.*)

that the presiding officer in the absence of a Commissioner somehow becomes the Commissioner. Selig is not *de jure* Commissioner.

■ Petitioner next argues that Selig performs a number of functions previously performed by Commissioners of Baseball and often is treated and even referred to as Commissioner or Acting Commissioner. It asserts that Selig therefore is Commissioner *de facto*. Petitioner demonstrates a fundamental misunderstanding of the *de facto* doctrine. Even assuming that Selig on occasion has acted as if he were the Commissioner, the doctrine would be of no aid to the Miracle here.

"A de facto officer is one who is in actual possession of an office under the claim or color of an election or appointment, and is in the exercise of its functions and in the discharge of its duties." 2 FLETCHER § 374, at 238. "The de facto doctrine ... 'was introduced into the law ... as a matter of policy and necessity to protect the interests of the public and individuals, where those interests were involved in the official acts of persons exercising the duties of an office without being lawful officers.' The reason of the rule upon which this policy is founded is stated to be 'that third persons, from the nature of the case, cannot always investigate the right of one assuming to hold an important office' ... The rule of law, which makes him an officer de facto as to third persons confers on him no rights...." *In re George Ringler & Co.,* 204 N.Y. 30, 42–46, 97 N.E. 593 (1912) (*quoting State v. Carroll,* 38 Conn. 449). "The *de facto* officer doctrine validates *acts* upon which the public reasonably has relied. It does not change the fundamental nature of the act or transform the actor *Olympic Federal Savings and Loan Ass'n v. Director, Office of Thrift Supervision,* 732 F.Supp. 1183, 1196 n. 12 (D.D.C.1990).

Here, there is no evidence that the Miracle or, for that matter, anyone else relied to its detriment on Selig being the Commissioner of Baseball, as distinguished from the position he in fact holds. Nor is there any basis for concluding that Selig acted under color of an election to the Commissionership. Selig therefore fails to qualify as *defacto* Commis-

sioner, and there is a vacancy in the Commissioner's office.[9] Accordingly, the actions of the PBEC have not violated Article IX of the PBA.

*The Challenge To Bloch*

■ The Miracle's final argument is that Richard Bloch, the seventh member of the Board of Arbitration, should be dismissed because he is not impartial. The Court is cognizant of its power to remove an arbitrator "when the potential bias of a designated arbitrator would make arbitration proceedings simply a prelude to later judicial proceedings challenging the arbitration award." *Masthead Mac Drilling Corp. v. Fleck,* 549 F.Supp. 854, 856 (S.D.N.Y.1982); *see Erving v. Virginia Squires Basketball Club,* 468 F.2d 1064, 1067–68 (2d Cir.1972). Nevertheless, as petitioner has not presented substantial evidence of Bloch's bias, the Court declines to exercise this power and rejects the challenge to Bloch as premature. *See Roth v. Carvel Corp.,* 905 F.Supp. 196 (S.D.N.Y. 1995).

*Conclusion*

For all of the reasons discussed above, the petition is dismissed. The foregoing represents the Court's Findings of Facts and Conclusions of Law pursuant to Rule 52(a).

SO ORDERED.

---

**9.** This holding necessarily moots the issue of whether Selig is an independent Commissioner.